2012 COA 123

**INTERMOUNTAIN RURAL ELECTRIC ASSOCIATION, a Colorado nonprofit association, Plaintiff–Appellant,**

v.

**COLORADO PUBLIC UTILITIES COMMISSION; Doug Dean, in his capacity as Director of the Public Utilities Commission; Joshua Epel, in his capacity as Chairman of the Public Utilities Commission; Matthew Baker, in his capacity as Commissioner of the Public Utilities Commission; and James Tarpey, in his capacity as Commissioner of the Public Utilities Commission, Defendants–Appellees.**

No. 11CA1398.

Colorado Court of Appeals, Div. V.

July 19, 2012.

Semple, Farrington & Everall, P.C., Martin Semple, M. Brent Case, Denver, Colorado, for Plaintiff–Appellant.

John W. Suthers, Attorney General, Erin A. Overturf, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge MILLER.

¶ 1 In early 2010, the members of the Public Utilities Commission (PUC) exchanged numerous e-mails regarding proposed legislation for the Clean Air—Clean Jobs Act (CACJA), which was ultimately passed by the General Assembly and signed by the Governor. §§ 40–3.2–201 to –210, C.R.S.2011. This case raises the issue whether these e-mail exchanges constituted "meetings" for purposes of the Colorado Open Meetings Law (OML), sections 24–6–401 to –402, C.R.S.2011. Because we conclude that considering and providing input on proposed legislation was not connected to the PUC's policy-making function, we hold that the exchanges did not constitute such meetings.

¶ 2 We therefore affirm the trial court's summary judgment in favor of defendants, the PUC and the individual Commissioners and the Director of the PUC in their official capacities, and against plaintiff, Intermountain Rural Electric Association (IREA), on its cross-motion for summary judgment.

## I. Background

¶ 3 The following facts are not disputed by the parties. On March 15, 2010, a bill for the CACJA was introduced in the House of Representatives. The next day, the Director of the PUC provided testimony to the House Committee on Transportation and Energy, stating that the PUC did not oppose the proposed legislation. Both houses passed the bill, and it was signed into law. The CACJA requires Colorado rate-regulated electric utilities to submit emission reduction plans to the PUC, which then conducts an evidentiary hearing before entering an order approving, denying, or modifying the plans. § 40–3.2–204, C.R.S.2011.

¶ 4 The e-mail exchanges at issue preceded the enactment of the CACJA. In early 2010,

Kelly Nordini, a member of the Governor's staff, e-mailed then-PUC Chairman Ron Binz seeking input on proposed language for inclusion in an earlier version of the bill. The proposed language was suggested by Public Service Company of Colorado (PSCo). An e-mail conversation ensued among the Commissioners about the proposed legislation, and Nordini was copied on fifteen of the eighteen e-mails. Generally, the e-mails consisted of edits to the draft legislative language and detailed discussion among the Commissioners about the bill with regard to various topics, including rate-making mechanisms, the impact of the proposed legislation on the PUC's authority, and the procedural requirements that the legislation would place on the PUC.

¶ 5 IREA, a cooperative electric utility subject to regulation by the PUC, brought suit against the PUC, its Director, and the Commissioners in their official capacities, seeking a declaration that (1) the e-mails were "meetings" subject to the OML; (2) defendants violated the OML when they failed to provide notice of the meetings, make the meetings public, or enter an executive session; and (3) any formal action arising out of the e-mails was invalid. It also sought a mandatory injunction requiring defendants to make the e-mails public.

¶ 6 Defendants moved for summary judgment, arguing that the e-mails were not "meetings" as defined by section 24–6–402(1)(b), C.R.S.2011, and were therefore not subject to the OML. They also argued that the e-mails were protected by the deliberative process privilege. IREA filed a cross-motion for summary judgment, and opposed defendants' motion.

¶ 7 The trial court concluded in a thorough and well-written opinion that the e-mails were not "meetings" under section 24–6–402(1)(b), and were therefore not subject to the OML. Section 24–6–402(1)(b) defines a "meeting" as "any kind of gathering, convened to discuss public business, in person, by telephone, electronically, or by other means of communication." While the trial court determined that the e-mails were "gatherings," it concluded that they were not

"convened to discuss public business." It therefore granted summary judgment in favor of defendants and denied IREA's cross-motion for summary judgment.

¶ 8 IREA contends that the trial court erred when it determined that the e-mails were not "convened to discuss public business." We disagree and therefore affirm.

## II. Standard of Review

¶ 9 The sole issue on appeal is whether the OML applies to the e-mails. Interpreting the OML presents a question of law which we review de novo. *Board of County Comm'rs v. Costilla County Conservancy Dist.*, 88 P.3d 1188, 1192 (Colo.2004).

¶ 10 Likewise, we review a grant of summary judgment de novo. *Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1074 (Colo.2010). We will uphold a grant of summary judgment only where the pleadings and supporting documents demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* (citing C.R.C.P. 56(c)). The nonmoving party receives "the benefit of all favorable inferences reasonably drawn from the undisputed facts" and all doubts are resolved in its favor. *Id.*

## III. The OML

¶ 11 The OML is intended to "afford the public access to a broad range of meetings at which public business is considered." *Costilla County*, 88 P.3d at 1193 (quoting *Benson v. McCormick*, 195 Colo. 381, 383, 578 P.2d 651, 652 (1978)). We interpret the OML broadly in order to further the legislature's intent to give citizens a greater opportunity to meaningfully participate in the decision-making process by becoming fully informed on issues of public importance. *Id.*

¶ 12 The OML provides, in relevant part, "All meetings of two or more members of any state public body [1] at which any public business is discussed or at which any formal action may be taken are declared to be public

---

1. The parties do not dispute that the PUC is a "state public body."

meetings open to the public at all times." § 24–6–402(2)(a), C.R.S.2011. As noted, it defines a "meeting" as "any kind of gathering, convened to discuss public business, in person, by telephone, electronically, or by other means of communication." § 24–6–402(1)(b). If a meeting is subject to the OML, it may be held only after "full and timely notice to the public." § 24–6–402(2)(c), C.R.S.2011. Minutes of the meeting must be taken, and those minutes must be open to public inspection. § 24–6–402(2)(d)(I), C.R.S. 2011.

¶ 13 The parties do not dispute on appeal that the exchange of e-mails constituted a "gathering," but they dispute whether the e-mails discussed "public business."

¶ 14 The statute does not define the phrase "discuss public business," as it appears in the definition of a "meeting." The supreme court, however, has held that the phrase refers to a public body's public policy-making function: "[A] meeting must be part of the policy-making process to be subject to the requirements of the OML. A meeting is part of the policy-making process if it concerns a matter related to the policy-making function of the ... public body holding or attending the meeting." *Costilla County*, 88 P.3d at 1194.

## IV.  Analysis

¶ 15 IREA argues that the trial court misconstrued the supreme court's holding in *Costilla County*, and consequently erred when it concluded that the e-mails were not "convened to discuss public business," and therefore did not constitute "meetings" subject to the OML. We disagree.

### A.  The PUC's Policy–Making Responsibility

¶ 16 IREA claims that that the e-mails were part of the PUC's policy-making process. Focusing on the supreme court's holding in *Costilla County*, IREA contends that "[t]he hurdle one must clear" to establish a connection between the meeting and the policy-making function of the group convening the meeting is low. It argues that the e-mails, which formulated the PUC's position on the proposed legislation, were rationally connected to its policy-making responsibilities concerning the regulation of public utilities in Colorado because the proposed legislation sought to define the PUC's regulatory authority over certain matters. However, this argument relies on an improper characterization of a "policy-making responsibility" as defined by *Costilla County*.

¶ 17 In *Costilla County*, the supreme court held that, "[i]f the record supports the conclusion that [a] meeting is rationally connected to the policy-making responsibilities of the public body holding or attending the meeting, then the meeting is subject to the OML." 88 P.3d at 1189. The court explained that the "policy-making responsibilities" of a public body are limited to taking action with regard to rules, regulations, ordinances, or formal actions. *See id.* ("A meeting is part of the policy-making process when the meeting is held for the purpose of discussing or undertaking a rule, regulation, ordinance, or formal action."). Whether an action is part of a "policy-making responsibility" of a public body therefore partially depends on the extent of the policy-making powers of that body. *See id.* at 1194 ("there must be a demonstrated link between the meeting and the *policy-making powers of the government entity* holding or attending the meeting") (emphasis added). As the court summarized in *Costilla County*, "[I]n order for a meeting to be subject to the OML, the record must demonstrate a meaningful connection between the meeting itself and the policy-making powers of the public body holding or attending the meeting." *Id.* Accordingly, to prevail on a claim under the OML, a party must point to a pending action by the public body holding the meeting with regard to a rule, regulation, ordinance, or formal action by that public body that has a meaningful connection to the gathering in question.

¶ 18 IREA argues that the supreme court listed "undertaking a rule, regulation, ordinance, or formal action" only as examples of what can constitute public policy-making. The supreme court's analysis in *Costilla County* convinces us otherwise. In *Costilla County*, the court concluded that a meeting attended by two of the three members (a quorum) of the Board of County Commis-

sioners of Costilla County was not subject to the OML. *Id.* at 1189, 1195–96. At the time of the meeting, a local mine was seeping waste into a nearby stream, and two state agencies, the Colorado Department of Public Health and Environment (CDPHE) and the Department of Natural Resources, and the company operating the mine called the meeting to discuss both the mine's compliance with an order from the CDPHE to cease and desist and the corrective action that the mine would take with regard to the seeping. *Id.* at 1190–91.

¶ 19 While the meeting addressed "matters that were of concern to the citizens of Costilla County … the Board was not considering any policy-making decisions or actions regarding the mine" at the time of the meeting. *Id.* at 1195. The County Land Use Administrator granted building permits to the mining company three weeks after the meeting for the purpose of building a water treatment facility, and shortly after the meeting the mining company donated $30,000 to the Costilla County Water and Sanitation Department. *Id.* However, the record did not link either action to the meeting. *Id.*

¶ 20 The supreme court concluded that the OML did not apply because the record did not establish a connection between the meeting and "the policy-making function of the Board." *Id.* at 1196. The court explained that "[n]either the permits nor the donation were proposed or considered at the … meeting or subsequently 'rubber stamped' by a later open meeting of the Board." *Id.* at 1195. Further, neither the record "nor the trial court's findings establish[ed] that the Board adopted any rule, regulation, or ordinance or took any formal action based on" the meeting. *Id.*

¶ 21 The court also noted that, although the Costilla County Land Use Code appeared to require the Board to hear appeals from building permits, the Board's appellate powers were insufficiently connected to the meeting. *Id.* at 1195 n. 4. It reached this conclu-

sion because (1) it was not clear that the Board had appellate powers over the permits at issue and (2) nothing indicated that an appeal of the building permit was filed with the Board. *Id.* Thus, when it determined that the Board did not violate the OML, the supreme court relied exclusively on the fact that the record did not show any pending action related to a rule, regulation, ordinance, or any other concrete formal action by the Board at the time of the meeting.

¶ 22 IREA argues that the PUC's formation of an opinion on the bill was rationally connected to its constitutional and statutory authority to regulate public utilities. Based on the supreme court's analysis in *Costilla County,* we cannot say that the hypothetical effect of either providing input to the Governor's staff with regard to draft language for a bill pending before the legislature or advising a legislative committee that the PUC did not oppose the bill constituted part of the PUC's policy-making function.

¶ 23 A commission does not engage in policy-making by providing input on proposed legislation, because passing legislation falls exclusively under the policy-making functions of the General Assembly and the Governor. *See* Colo. Const. art. V, §§ 1(1), 39. The PUC is not empowered to pass legislation.[2] *See, e.g.,* Colo. Const. art. XXV. While the proposed legislation clearly had a potential effect on the PUC's future regulatory actions *generally,* forming an opinion about the legislation had no demonstrable connection to any pending regulatory action of the PUC here. Nor does the record indicate any pending action connected to the e-mails with regard to a rule, regulation, ordinance, or other formal action within the policy-making powers of the PUC.

¶ 24 We therefore conclude that neither suggesting edits to language proposed for inclusion in a legislative bill, nor stating a position on the bill before a legislative com-

---

**2.** Section 24–6–402(2)(d)(III), C.R.S.2011, provides, in part, "If elected officials use electronic mail to discuss pending legislation or other public business among themselves, the electronic mail shall be subject to the requirements of this section." The parties did not address this provi-

sion in their briefs in this court and advised us during oral argument that, in their view, the provision is not relevant to the issues on appeal. We conclude that we need not consider it to decide the appeal.

mittee was meaningfully connected to any public policy-making function of the PUC within the meaning of the OML.

### B. Whether the E-mails Were "Held" for the Purpose of "Discussing or Undertaking a Formal Action"

¶ 25 IREA also argues that the e-mails constituted a "formal action" of the PUC because the PUC is "authorized" to engage in discussions on pending legislative proposals. To support this argument, IREA points to the PUC's endorsement of the position that "Commissioner participation in the legislative process is inherent in the PUC's duty."[3] It also cites to section 40–6–122, C.R.S.2011, and 4 Code Colo. Regs 723–1:1105 (2011), a statute and a PUC rule that anticipate Commissioners' discussions of "pending legislative proposals" and "communications related to legislation," respectively. IREA contends that the PUC undertook a "formal action" when it reached a "formal opinion" about the bill and the Director of the PUC subsequently presented that opinion to the legislature.[4]

¶ 26 IREA's argument fails to distinguish between "formal actions" of the PUC, which create public policy within the purview of the PUC's policy-making powers, and other duties and actions of the PUC, which do not. In *Costilla County*, the supreme court emphasized that the OML focuses on "actions associated with policy-making." *Costilla County*, 88 P.3d at 1193–94. The court clarified that policy-making consists of "discussing or undertaking a rule, regulation, ordinance, or formal action." *Id.* at 1189. "A meeting is part of the policy-making process if it concerns a matter related to the *policy-making function of the ... body holding or attending the meeting.*" *Id.* at 1194 (emphasis added). Thus, to be a "formal action" and therefore part of the "policy-

making responsibility" of the group, an action must fall within the group's ability *to make public policy. See Hanover Sch. Dist. No. 28 v. Barbour*, 171 P.3d 223, 227 (Colo. 2007) (the OML applies to "meetings that concern matters related to *the policy-making function of that body*") (emphasis added).

¶ 27 As an organization with substantial expertise in the area of public utility regulation and as a regulatory agency that would be subject to the provisions of the proposed CACJA, the PUC was in a position to opine about the draft legislation and provide input to the Governor and the legislature on the bill. While the PUC may engage in forming opinions about potential legislation and providing feedback to the Governor and testimony to the legislature about that legislation, those actions do not constitute the making of public policy by the PUC. Section 40–6–122 and 4 Code Colo. Regs. 723–1:1105, which IREA cites for the proposition that the PUC is "authorized" to engage in discussion of pending legislative proposals, merely recognize that the Commissioners may engage in such activities; they do not grant the PUC the "authority" or power to do so as a matter of policy-making. *See* § 40–6–122 (providing that, for purposes of required disclosures of certain ex parte communications, an "adjudicatory proceeding" does not include discussions on pending legislative proposals); *see also* 4 Code Colo. Regs. 723–1:1105(b)(IV) (exempting "communications relating to legislation" from prohibited ex parte communications).

¶ 28 As defendants point out, the Governor and the legislature were free to disregard the opinion of the PUC about the proposed CACJA. The fact that engaging in the legislative process may be "inherent in the PUC's duties" does not mean that doing so implicates the PUC's policy-making power. Ultimately, the public policy-making that oc-

---

3. The quoted language comes from a trial court order in an earlier case holding that the e-mails at issue were subject to the deliberative process privilege after the Colorado Mining Association requested them pursuant to the Colorado Open Records Act, sections 24–72–200.1 and 24–72–206, C.R.S.2011. Order, *Colorado Mining Ass'n v. Ritter*, Civ. Action No. 10CV5199, Denver District Court (Aug. 13, 2010). The PUC quoted this

language in supporting its motion for summary judgment in the district court.

4. Defendants do not concede that the Director's testimony resulted from an opinion formulated in the e-mails; however, for purposes of this appeal, we assume that the Director's testimony about the PUC's position was derived from the e-mails.

curred with the PUC's input via the e-mails was the enactment by the General Assembly of the CACJA. The legislative power falls within the purview of the General Assembly's public policy-making power, and not that of the PUC. *See* Colo. Const. art. V, § 1(1).

¶ 29 IREA also contends that the e-mails constitute a "formal action" because the State of Colorado successfully asserted the deliberative process privilege with regard to the e-mails in an earlier suit brought by the Colorado Mining Association. To support this claim, IREA argues that, in order to be privileged, the e-mails must have been part of "the deliberative process by which a decision is made" and have been "predecisional (i.e., generated before the adoption of an agency policy or decision)." *City of Colorado Springs v. White*, 967 P.2d 1042, 1051–52 (Colo.1998).

¶ 30 The mere fact that a public body reaches a "decision" does not necessarily mean that making the decision is a "formal action." If anything, the fact that the e-mails were subject to the deliberative process privilege indicates that they were not part of the PUC's "policy-making responsibility." The deliberative process privilege ordinarily "covers recommendations, advisory opinions, draft documents, proposals, suggestions, and other subjective documents that reflect the personal opinions of the writer *rather than the policy of the agency.*" *Id.* at 1053 (emphasis added). Here, forming an opinion about drafts of the CACJA was incidental to, and not part of, the PUC's policy-making function. Reaching and presenting an opinion about the proposed CACJA were therefore not a "formal action" of defendants.

¶ 31 For these reasons, we conclude that the e-mails are not subject to the OML, and we therefore affirm the trial court's summary judgment in favor of defendants, and its denial of IREA's cross-motion for summary judgment.

¶ 32 The judgment is affirmed.

Judge LOEB and Judge HAWTHORNE concur.